Judgment to be reversed.

—o+o—

## The inhabitants of the town of GOSHEN *against* The inhabitants of the town of STONINGTON.

In an action of *assumpsit,* by the town of *G.* against the town of *S.,* for support furnished, by the plaintiffs, to a pauper of *S.,* residing in *G.,* it was held, that a recovery might be had, without proof of an actual request, or an express promise, on the part of the defendants.

A clergyman, in the celebration of marriage, is a public civil officer ; and

Litchfield,
June,
1822.

Goshen
v.
Stonington.

his acts in that capacity are admissible, as *prima facie* evidence of his official character.

A deacon of the *Methodist Episcopal* church, licenced to preach, and actually preaching, as a travelling circuit preacher, upon a circuit including the town in which he dwells, is not *settled in the work of the ministry* within the late marriage act.

The act of *May*, 1820, declaring all marriages, previously celebrated, in this state, by a minister, ordained, and empowered to celebrate marriages, according to the forms and usages of any religious society or denomination, to be valid, is not void as repugnant to the constitution of this state, or of the *United States*.

Nor is such act void, because it may, in its operation, impair vested rights.

Nor is its retrospective operation to be limited, by construction, to the parties to the marriage and their issue.

That a law is explicitly retrospective, and may affect the rights of individuals, does not authorize the judiciary to declare it void, if it be just and reasonable, and conducive to the general good.

If a law be not explicitly retrospective, the court will not, by construction, give it a retrospective operation.

This was an action of *assumpsit*, to recover the sum of 380 dollars, expended, by the plaintiffs, at the special instance and request of the defendants, for the support of *Betsey Cooke*, the wife of *Joseph Cooke*, and their five children, from the 8th of *October*, 1818, to the 9th of *September*, 1820, alleged to be paupers, having their legal settlement in the town of *Stonington*, and residing in the town of *Goshen*, at the time the support was furnished.

The cause was tried at *Litchfield, August* term, 1821, before *Bristol*, J.

*Joseph Cooke* was born, and had his legal place of settlement, in the town of *Stonington;* and no evidence was offered to shew, that he had ever acquired a settlement in any other place. Whether *Betsey Cooke* and her children were legally settled in the town of *Stonington*, depended upon the the validity of her marriage with *Joseph Cooke*.

About fourteen years before the trial, and before the birth of any of the children, *Joseph* and *Betsey* were married, by one *Henry Christie*, who at that time dwelt, and for many years before his death had dwelt, in the town of *Cornwall*, in this state. In order to shew, that *Christie* had authority to solemnize the marriage, the plaintiffs stated and offered evidence to prove, that he was an ordained deacon of the *Methodist Episcopal* church. To establish this fact, the plaintiffs offered evidence to shew, that *Christie* had been settled as a located preacher, within certain local limits, comprehending the town of *Cornwall* and some other towns adjacent; and

that being so located, he had, according to the usages and customs of the *Methodist* church, authority to celebrate marriages. To prove, that *Christie* had been ordained a deacon of that church, the plaintiffs offered evidence to shew, that about the year 1791, he was licenced to preach, and did actually preach, as a travelling circuit preacher, upon a circuit including the town of *Cornwall,* where he dwelt ; that he was married not long after, and removed to the town of *New-Lebanon* in the state of *New-York*, where he remained until the year 1795, after which he returned to *Cornwall,* with his wife, where he constantly resided until about four years before the trial, when he removed into the western part of the state of *New-York ;* that upon his return from *New-Lebanon*, he preached the gospel, as an ordained local deacon of the *Methodist* church, and was received as such within the circuit ; that from that period, until a short time before his removal into the state of *New-York,* when he became infirm, he had continued to preach the gospel, to attend the interment of the dead, to baptize, to celebrate marriages, to assist the ruling elder at the administration of the eucharist, and to do all other things, which, according to the usages of the *Methodist* church, it was his duty, as an ordained deacon, to do ; and that he was received and treated, by the ruling elders of his church, by his brethren in the ministry, and by the people of that denomination within his limits, and so far as his acquaintance with them extended, as an ordained deacon of the *Methodist* church. To the admission of this evidence, the defendants objected, on the ground that the fact of *Christie's* ordination ought to be proved, by evidence of a different kind. But the judge overruled the objection, and permitted the facts so offered to be proved to go to the jury. At the time of the trial, *Christie* lived in the western part of the state of *New-York*, at some place not ascertained. The mode of constituting a deacon, according to the constitution of the *Methodist* church, was proved to be this : He is elected or approved, by the general conference, and ordained by the bishop ; and a book is kept, by the steward of the conference, containing the names of the deacons thus constituted.

No evidence was given by the plaintiffs to prove, that any part of the money mentioned in the declaration, was by them expended, by an *actual request* made by the defendants. But the plaintiffs claimed to have proved, that immediately upon

*Litchfield,
June,
1822.*

*Goshen
v.
Stonington.*

*Litchfield,*
*June,*
*1822.*

*Goshen*
*v.*
*Stonington.*

the said *Betsey* and her children becoming chargeable to the plaintiffs, they gave notice thereof to the defendants, and that she and her children were likely so to continue, and requested the defendants to come and take them away, which they neglected to do.

The plaintiffs offered no evidence of any express promise, by the defendants, to pay the sum specified in the declaration, or any part thereof.

The judge instructed the jury, that if they should find *Christie* was duly ordained as a deacon, and authorized to marry, according to the usages of the *Methodist Episcopal* church, the marriage was validated by the statute respecting marriages, passed in 1820; and in this case, it became immaterial to enquire whether he was *settled in the work of the ministry*, within the meaning of the former law respecting marriages. The judge further instructed the jury, that it was not necessary that the defendants should, in point of fact, make a request of the plaintiffs to furnish supplies, or an actual promise to pay for them.

The jury having given a verdict for the plaintiffs, the defendant moved for a new trial, on the ground that evidence adduced by the plaintiffs was improperly received, and the direction to the jury was erroneous.

*Bacon,* in support of the motion, contended, 1. That without an actual request or promise, on the part of the defendants, the plaintiffs could not recover; because, from the remaining facts, the law *implies* no promise. Where the consideration is *past*, as in the present case, *assumpsit* is not sustainable, unless it was moved by a preceding request. 1 *Swift's Dig.* 687. *Jeremy* v. *Goochman, Cro. Eliz.* 442. *Hayes* v. *Warren,* 2 *Stra.* 933. *Bulkley* & al. v. *Landon & al.* 2 *Conn. Rep.* 404. 415, 6. In the case last cited, an actual promise was proved; but being founded on a past consideration, without a previous request, it was held to be void. The present is a stronger case, as no actual promise was here proved, and the jury were instructed, that a previous request was unnecessary. *Atkins* & al. v. *Banwell* & al. 2 *East.* 505. was, like the present, an action of *indebitatus assumpsit*, in favour of one parish against another, for the support of paupers. But as the parish in which the paupers were settled had made no *actual* request of the plaintiffs to support the paupers, and no *actual* promise to pay for their support, they

were held not to be liable. Lord *Ellenborough* says, "A <span>*Litchfield,*<br>June,<br>1822.</span> moral obligation is a good consideration for an *express* promise; but it has never been carried further, so as to raise an implied promise in law. There is no precedent, principle or colour, for maintaining this action."

<span>*Goshen*<br>*v.*<br>*Stonington.*</span>

That case cannot be distinguished from the present, except in one point, which operates decisively against the plaintiffs, and is the foundation of a distinct objection to their recovery. It is not stated in this declaration, that the paupers resided in *Goshen,* when the support was furnished ; but, for aught that appears, they then resided in *Stonington.* If the direction of the judge was correct, the select-men of one town may look into the prudential affairs of any other town in the state, and if, in their opinion, the paupers in the latter town are not supported with sufficient liberality, such select-men may furnish additional supplies *ad libitum*, and recover in this form of action.

It may be said, that this is a defect in the declaration, of which the defendants must avail themselves, by motion in arrest. But this they cannot do ; for if the paupers resided in *Stonington,* at the time the support was furnished, yet if it was furnished at the actual request of the defendants, or if they had made an actual promise to pay, both of which are alleged in the declaration, they would be liable.

2. That the marriage between *Joseph Cooke* and *Betsey Cooke*, solemnized by *Henry Christie*, was originally void ; *Christie* not being authorized, by the then existing laws of the state, to celebrate marriages. *Roberts* v. *State Treasurer, 2 Root,* 381. *Crum* v. *Crum, Superior* court, *New-London* county, *January* term, 1816. *Goshen* v. *Stonington, Superior* court, *Litchfield* county, *February* term, 1820, *coram Hosmer,* Ch. J. If the marriage was not valid, at the time, no settlement was gained thereby, by *Betsey Cooke* and her children. *Chinham* v. *Preston, 2 Bla. Rep.* 192. *Milford* v. *Worcester, 7 Mass. Rep.* 48. 57, 8. These paupers were then, settled in *Goshen,* until the passing of the marriage act of *May,* 1820. (*a*)

(*a*) The 6th section of the act referred to, is as follows : " That all marriages, which have heretofore been performed and celebrated in this state, by a magistrate, justice of the peace, or a minister, ordained, or qualified, and empowered to celebrate marriages, according to the forms and usages of any religious society or denomination, are hereby declared to be good and valid, to all intents and purposes whatever ; any law, custom or usage to the contrary notwithstanding."

3. That this act is not to be construed so as to vary or affect the rights of the parties, existing before, or at the time it was passed. The verdict was given, under the direction of the judge, for the expense of support during the whole time, from the 8th of *October*, 1818, to the 9th of *September*, 1820 ; thus giving to the statute a retro-active operation of a most striking and dangerous character. It transfers the settlement of the paupers from *Goshen* to *Stonington*, and thereby removes a burden and legal obligation from one town and places it upon another. It not only does this, but subjects *Stonington* to pay to *Goshen* the expenses, which had accrued for the support of their own paupers, prior to the existence of the statute. The legislature may, with equal propriety, say, that *A.* shalt pay the debts or support the children of *B.*, and not only support them in future, but pay for the expense of their previous support. If the statute requires this construction, it is void as a retrospective law. *Dr. Bonham's* case, 8 *Co.* 118. *Gillmore* v. *Shooter's* exr. 2 *Mod.* 310. *Wales* v. *Stitson,* 2 *Mass. Rep.* 143, 146. *Call* v. *Hagger* & al. 8 *Mass. Rep.* 423. *King* v. *Dedham Bank,* 15 *Mass. Rep.* 447. *Foster* & al. exrs. v. *Essex Bank,* 16 *Mass. Rep.* 245. 271. *Dash* v. *Van Kleeck,* 7 *Johns. Rep.* 477. 502. *Society for propagating the Gospel &c.* v. *Wheeler,* cited 4 *Wheat.* 135.

The statute in question admits of a construction, which will give it all the effect which the object of the legislature requires, without involving these absurd consequences ; and it is the duty of the court, in construing a statute, to reject such consequences. 1 *Bla. Comm.* 91. The object of the legislature was, to confirm the marriages, *as to the parties and their issue.* By confining it to them, the vested rights of third persons remain undisturbed.

4. That admitting the statute might be so construed as to have a retrospective operation, yet the evidence adduced by the plaintiffs, was incompetent to prove a marriage, " celebrated by a minister, ordained according to the forms and usages of any religious society." The best and most obvious source of evidence to prove the ordination was to have been found in the register, accompanied with the oath of the steward of the conference, the bishop, who performed the ceremony, and *Christie,* the subject of it. But the plaintiffs offered no evidence from this source : they resorted to an inferior species of evidence. The circumstances proved may be considered as consisting of two parts or divisions.

First, the plaintiffs proved, that in the year 1791, *Christie* was licensed as a travelling preacher ; that he was married ; that he removed with his wife into the state of *New-York,* and back again. Will any lawyer say, that this evidence conduced to prove, that *Christie* was ordained according to the forms and usages of the *Methodist* society ? A simple statement of the fact to be proved, and the evidence admitted to prove it, precludes the possibility of illustrating the point by argument.

The other part of the evidence was, that *Christie* preached the gospel as an ordained deacon ; attended the interment of the dead ; celebrated marriages ; and performed all the other duties of an ordained deacon ; and was received, by ruling elders, and the *Methodists* generally, as an ordained deacon. By admitting this testimony, a most important rule of evidence was violated. It was not the best evidence, which the nature of the case admitted of, and which was in the power of the plaintiffs. The register might have been produced, accompanied by the testimony of the steward, who made it. *Christie*, and others who were officially engaged in the transaction, are living ; and the ordination might have been proved, by the positive testimony of witnesses. The inferior evidence ought, therefore, to have been rejected. *Rhind* v. *Wilkinson*, 2 *Taun.* 237. *Beers* v *Hawley*, 3 *Conn. Rep.* 111. *Parry* v. *Collis*, 1 *Esp. Rep.* 399. *Williams* v. *East-India Company*, 3 *East* 192. *Commonwealth* v. *Kinison*, 4 *Mass. Rep.* 646.

The rule applicable to certain peace officers, as to whom it is sufficient to prove, that they acted in those characters, without producing their appointments, is confined to this class of public civil officers ; and the stat. 2 *Geo.* 1. *c.* 30. *s.* 32. was necessary to extend it to revenue officers. We have no statute extending this rule to *Methodist* deacons. They are not public officers of any description. Their authority emanates from a private source, and must be strictly proved, before their acts can affect the rights of third persons. The principle assumed for the admission of this evidence, is of a novel character. To prove that a man is *authorized* to do an act, you have only to prove, that he *did* the act. To prove *Christie's* authority to celebrate marriages, the plaintiffs were permitted to prove, that he did celebrate them.

Nor is this case within the principle of another class of cases where strict proof of the appointment or authority is dis-

*Litchfield,*
*June,*
*1822.*

*Goshen*
*v*
*Stonington.*

pensed with, *viz.* where by the conduct or admission of the party against whom the evidence is offered, he has precluded himself from denying the fact; as in an action, in *England,* against a clergyman, for non-residence, his own acts, as receiving tithes, cutting timber on the glebe &c. are evidence against him; but they would not be against third persons. *Bevan* v. *Williams,* 3 *Term Rep.* 635. n. *Peacock* v. *Harris,* 10 *East* 104.　The defendants have never admitted, that *Christie* was ordained; and this fact must be proved, like every other fact in a case, by the best evidence; and neither the reputation, nor the acts of *Christie,* are admissible to prove it. *Pickford* v. *Gutch,* 8 *Term Rep.* 305. n.　*Moises* v. *Thornton,* 8 *Term Rep.* 303.

*Benedict* and *North,* contra, contended, 1. That it was not necessary that an express request, or an express promise, should be proved, in order to support the declaration. Under the *indebitatus* count, which, in modern practice, has taken the place of the *quantum meruit* and *quantum valebant* counts, the request, on which that which was the consideration of the debt, was performed, may be *implied* in evidence.. An actual promise is seldom, if ever, proved. 1 *Chitt. Plead.* 338. 2 *Chitt. Plead.* 6. n. t. 2 *Wms. Saund.* 122. a. n. 2. 1 *Wms. Saund.* 264. n. 1.　The plaintiffs were under a legal obligation to make the advancements; and they were made for the benefit of the defendants, who were thereby relieved, to the same amount.　The doctrine of *past consideration* has never been applied, and is inapplicable, to a case like this. 1 *Chitt. Plead.* 340. 1 *Selw. N. P.* 67. n. 11.

It sufficiently appears, that the paupers resided in *Goshen,* when the support was furnished; as they became chargeable to *Goshen.*　The fact must have been proved, that they were then there; otherwise they could not have become chargeable to that town.　But, what is decisive on this subject, is, that there is nothing to shew, that there was any controversy about this fact, on the trial; or any claim that the judge should instruct the jury on that point.　The exception, if there were any foundation for it in truth, could not be taken on this motion.

2. That the evidence adduced by the plaintiffs of *Christie's* having acted as an ordained minister, and of his having been received as such, by the denomination to which he belonged, was properly admitted, to prove his official character.　In the

first place, a person celebrating marriage as an ordained minister, is, *quoad hoc*, a public civil officer; and his official character may be proved in the same manner as that of a justice of the peace. *Berryman* v. *Wise*, 4 *Term Rep.* 366, 7. His functions in relation to this subject, are of a civil nature. To render an ordained minister a civil officer, it is not necessary that he should have derived his appointment from the government. If he be *in fact* an ordained minister, in what way soever he may have been constituted, the law recognizes him as a civil officer, for the purpose of celebrating marriage. *Fowler* v. *Beebe & al.* 9 *Mass. Rep.* 231. Secondly, it does not appear that evidence of any higher nature existed within the power of the party. Thirdly, to require evidence of a higher nature, if it existed and could be had, would produce great inconvenience, and lead to manifest absurdity; as it would, on the same principle, be necessary to prove the qualifications of the members of the conference, who elected the minister, and the authority of the bishop who ordained him. A copy from the register, certified by the steward of the conference, who is in no sense a public officer, would clearly not be evidence.

3. That *Christie's* official character, as an ordained minister, being established, he was authorized, by the statute then in force, to celebrate this marriage. *Stat. tit.* 105. *c.* 1. *s.* 2. ed. 1808. He was "settled in the work of the ministry," within the meaning of the statute; and the marriage was solemnized "within the county wherein he dwelt."

4. That admitting the marriage to have been invalid, under the law, it was clearly confirmed and established, by the act of *May*, 1820. That the provisions of that act extend to this case, is not denied; but the claim of the defendants is, that the court ought not to carry those provisions into effect. Why? Not because they are repugnant to the letter of any clause in the constitution; but because the act, on general principles, ought not to be enforced, so far as it takes away a right, or creates a liability, or subjects to a burden. This ground is untenable. The intention of the legislature, expressed in a statute, is binding, unless directly repugnant to the constitution. 1 *Bla. Comm.* 91. n. There is, moreover, a clear distinction between confirming acts and original acts taking away vested rights. The design of a confirming act, is, to rectify some mistake, or supply some accidental omission; and its effect is to establish matters in the condition in

which it was the intention of all concerned that they should be. This power has been exercised, by our legislature, and by other well regulated governments, in innumerable instances. *Doug.* 661. n. 1. *Calder* & ux. v. *Bull &* ux. 3 *Dall.* 386. *Walter* v. *Bacon &* al. 8 *Mass. Rep.* 468. *Lock*, admr. v. *Dane &* al. 9 *Mass. Rep.* 360. *Waterbury* v. *Clark,* 4 *Day* 198. and the acts therein referred to.

HOSMER, Ch. J. In this case, several questions have been raised, on which I shall express an opinion, in the order in which they have been presented by the defendants' counsel.

1. It has been objected, that an actual request for the supplies furnished the paupers, or an express promise of payment, was requisite, to fix a legal liability on the defendants.

If the advancements made had been voluntary, the objection would be well founded, and fatal to the plaintiffs' hopes ; but, they were compelled by law to make them ; and in this event, the law gives a right of recovery. The plaintiffs' case may be assimilated, to the payment of money by a surety for his principal, which furnishes a sufficient cause of action, without an actual request or promise. 1 *Chitt. Plead.* 340. *Exall* v. *Partridge* & al. 8 *Term Rep.* 308. 310. *Child* v. *Morley,* 8 *Term Rep.* 610. 614.

It has been said, that the paupers do not appear to have had their residence in *Goshen,* when their necessities were supplied. No such objection was made on the trial ; for had it been, the plaintiffs must have been nonsuited. The fact, however, on this point, has been misconceived. The motion states, that the plaintiffs claimed to have proved, that "immediately upon the said *Betsey* and her children becoming chargeable to the plaintiffs, they gave notice thereof to the defendants ; and that she and her children were likely so to continue ; and requested the defendants to come and take them away, which they neglected to do." It is, therefore, unquestionable, that the title of the plaintiffs to recover, was placed on the foundation of an actual residence of the paupers in *Goshen,* and necessary advancements made to them.

2. The evidence of acts done by *Christie,* admitted to prove his ordination, has given birth to the next objection.

A clergyman in the administration of marriage, is a public civil officer, and in relation to this subject, is not at all distinguished from a judge of the superior or county court, or a justice of the peace, in the performance of the same duty. In

*Berryman* v. *Wise*, 4 *Term Rep.* 366. it was decided, by the court of *King's Bench*, as it had been previously decided by all the judges in *Westminster-Hall*, in the case of *Gordon*, that the legal capacity of peace officers, justices of the peace, constables, &c. was sufficiently proved, by their having acted in those characters, without the production of their appointments; and in *Vernon* v. *East-Hartford*, 3 *Conn. Rep.* 475. the same principle was recognized, by this court. The rules of evidence are of an artificial texture, framed for convenience in courts of justice, and founded on good reason ; (*Omychund* v. *Barker*, 1 *Atk.* 46.) and the admission of the acts of a clergyman in the celebration of marriage, as *prima facie* proof of his official character, is not only commodious, but may be necessary, in order to prevent the deplorable consequences which might result from the requirement of higher evidence. It would be a gross anomaly to admit the acts of one public officer as proof presumptive of his official capacity, and to deny the same evidence, when the official capacity of another public officer is in question.

3. An objection has been made to the validity of the marriage between *Betsey Cooke* and her husband, upon which the claim of the plaintiffs is founded. By the statute law, existing at the time, when this connexion was supposed to be formed, a minister invested with authority for this purpose, must have been *ordained*, and *settled in the work of the ministry*. *Christie*, the person who joined *Cooke* and wife in matrimony, was a *Methodist* clergyman, duly ordained, itinerating, as is the custom of many of that order, and *not settled*, within the intendment of the law. To remedy this and similar inconveniences, which had arisen from a misconstruction of the statute, and which, from their number, had become formidable, the legislature, in *May*, 1820, passed an act, rendering valid, *to all intents and purposes*, all marriages performed by an ordained minister, qualified and empowered to celebrate them, according to the forms and usages of any religious society or denomination. That *Cooke* and wife were married, by an authorized clergyman, conformably to the "forms and usages" of the religious denomination, of which he was a member, is not susceptible of dispute ; but to the efficacy of the confirmatory act of *May*, 1820, several objections have been made.

First, it was said, that the retrospective operation of the law may and ought to be obviated, by construing it to intend the validation of marriages merely, without imparting to it any

retrospection as to the rights of others. It must be admitted, that by construction, if it can be avoided, no statute should have a retrospect, anterior to the time of its commencement. *Helmore* v. *Shuter* & al. 2 *Show.* 17. *Dash* v. *Van Kleeck,* 7 *Johns. Rep.* 477. 485. This principle is founded on the supposition, that laws are intended to be prospective only. But when a statute, either by explicit provision, or necessary implication, is retroactive, there is no room for construction; and if the law ought not to be effectuated, it must be on a different principle. The act of *May,* 1820, is, in its expression, inconvertibly clear and definite. It does not pause, after imparting validity to marriages, but confirms them "to all intents and purposes." By this phraseology, they are declared to be valid *ab initio.* By limiting the act to one intent and purpose, we should contravene a most intelligible expression, that the contemplated marriages shall be valid, "to *all* intents and purposes." The sweeping universality of this phraseology, cannot be parried, by construction.

It is an admitted principle, that where it manifestly is within the intention of the legislature, that a subsequent act shall not controul the provisions of a former, it shall not be construed to have such operation, *even though* the words, strictly and grammatically, would have that effect: But, the intention of the legislature must first be ascertained from some legitimate source, before we contravene its letter. If the expressions of the law are clear and precise, and pointedly oppose the construction demanded; unless the object of it furnishes a reason for deviating from the plain meaning of its words, the expression must be considered as indicative of the intention. "Where the meaning of the statute is plain and evident, we must construe it according to the words; and it never can be admitted to give a construction to a statute different from the import of the words, from a conjecture that the legislature had a different meaning." *Curtis* v. *Hurlburt,* 2 *Conn. Rep.* 309. 315. There is nothing apparent on the act of *May,* 1820, by which the purpose of its enaction is defined, otherwise than by the language in which it is expressed; and if the occasion of passing it may be resorted to, the evidence resulting from this source, demonstrates, that the words of the law, and the intent of the legislature, were precisely identical.

Secondly, it has been insisted, that the law in question is unconstitutional. There is no pretence, that it is opposed to

*Litchfield,*
June,
1822.

Goshen
*v.*
Stonington.

the constitution of the *United States;* that is, that the confirmatory act is a law *ex post facto,* or one which impairs the obligation of contracts. By the second article of the constitution of *Connecticut,* it is affirmed, that "the powers of government shall be divided into three distinct departments, and each of them confided to a separate magistracy—to wit—those which are legislative to one; those which are executive, to another; and those which are judicial, to another." The law of *May,* 1820, has been considered as the exercise of a judiciary power, and for this reason, in contravention of the constitution; but the supposition is wholly destitute of support, as the act in question does not affect to give a construction to the former law, but most manifestly purports to impart validity to certain proceedings, which were erroneously supposed to be legal, and which the statute did not authorize. The power exercised, in its nature, is, exclusively, legislative, and not opposed to the recited article of the constitution.

Lastly, the defendants have insisted, (and on this objection the principal stress has been laid) that the law of *May,* 1820, being retrospective, and in violation of vested rights, it is the duty of the court to pronounce it void.

The retrospection of the act is indisputable, and equally so is its purpose to change the legal rights of the litigating parties. Whether in doing this there has been injustice, will be an enquiry in a subsequent part of my opinion.

It is universally admitted, and unsusceptible of dispute, that there may be retrospective laws impairing vested rights, which are unjust, neither according with sound legislation, nor the fundamental principles "of the social compact." If, for example, the legislature should enact a law, without any assignable reason, taking from *A.* his estate, and giving it to *B.*, the injustice would be flagrant, and the act would produce a sensation of universal insecurity.

On the other hand, laws of a retroactive nature, affecting the rights of individuals, not adverse to equitable principle, and highly promotive of the general good, have often been passed, and as often approved. In the case before us, the defendants have expressly conceded, that the law in question is valid, so far as respects the persons *de facto* married, and their issue. But, in that event, would it not have a retrospective operation on vested rights? The man and woman were unmarried, notwithstanding the formal ceremony which passed between them, and free, in point of law, to live in ce-

libacy, or contract matrimony with any person, at pleasure. It is a strong exercise of power, to compel two persons to marry, without their consent; and a palpable perversion of strict legal right. At the same time, the retrospective law, thus far directly operating on vested rights, is admitted to be unquestionably valid, because it is manifestly just.

I very much question, whether there is an existing government, in which laws of a retroactive nature and effect, impairing vested rights, but promotive of justice and the general good, have not been passed. In *England*, such laws frequently have been enacted; and the act of 26 *Geo.* 2. *cap.* 33., giving validity to former marriages, celebrated in any parish church or public chapel, is precisely of this description. *Doug.* 661. n. In the neighboring state of *Massachusetts*, there have been many such laws; (*Foster* & al. v. *The Essex Bank*, 16 *Mass. Rep.* from 257. to 261.) and the interposition of our own legislature, in similar cases, is familiar to gentlemen of the profession. The judgments of courts, when by accident a term has fallen through, have been established; the doings of a committee and conservator, not strictly legal, have been confirmed; and other laws have been passed, all affecting vested rights; but being incontrovertibly just, no disapprobation has ever been expressed. Who ever found fault with the law, authorizing the commissioners to require suitable railings on turnpike roads; and yet, in respect of all anterior grants, the act was retrospective, and put on the companies a new, and perhaps, an expensive burden. It, however, was just, demanded by the public good, and the subject of universal acquiescence.

The question, on which my attention is now exercised, has frequently arisen in courts, and has never been decided. It is not free from difficulty, on whichsoever side it is viewed; and although many persons have expressed an opinion on the abstract enquiry, it yet remains to be judicially determined.

Before I take a brief review of the cases on this subject, I will put out of question some arguments and decisions, which tend only to embarrass the matter in debate.

It has been said to be a principle of the *English* common law, that a statute is not to have a retrospective effect. *Bracton, lib.* 4. *fol.* 228. 2 *Inst.* 292. The cases do not warrant the point assumed; but this proposition they do establish, that a statute is not to be *construed* as having a retrospect. 6 *Bac. Abr.* 370. *Gwil.* ed. Such a construction ought never

*Litchfield,*
*June,*
*1822.*

*Goshen*
*v.*
*Stonington.*

to be given, unless the expression of the law imperiously requires it. The cases of *Helmore* v. *Shuter*, 2 *Show.* 17. *Couch* v. *Jeffries*, 4 *Burr*. 2460. were determined on this principle. To the same effect only are *Osborne* v. *Huger*, 1 *Bay* 179. *Ogden* v. *Blackledge*, 2 *Cranch*. 272. *Beadleston* v. *Sprague*, 6 *Johns. Rep.* 101. and *Wilkinson* v. *Meyer*, 2 *Ld. Raym.* 1350. ; although some have considered them as bearing, directly, on the question under discussion.

In the constitutions of some of the states, provision has been made, inhibiting the legislature from passing retrospective laws. This, undoubtedly, is a demonstration that, in the opinion of those states, such power ought never to be exercised, by their legislatures ; but it does not authorize the inference, that they would not have been invested with it, had there been no opposing constitutional provision. The opposite may more fairly be deduced; and hence the limitation imposed on the legislature by the constitution. I, however, shall make no deduction from this source. I know not, whether the measure ought to be ascribed to a recognition of the power in question, unless restrained, or to a prudent precaution, lest it should be assumed ; and it is the only fair result, in my judgment, that it has no relevancy to the question, I am endeavouring to discuss.

I shall not attempt to derive aid from the civilians, who sanction a retrospective law, if it be express ; but on the opinion of Lord *Bacon*, I am disposed to place more dependence. Opposed, as he manifestly is, to the general allowance of retroactive laws, he admits their validity in cases, " *ubi leges cum justitia retrospicere possent.*" *De Aug. Scient. lib.* 8. *c.* 3. *Aphor.* 47.—51. Sir *William Blackstone* (1 *Comm.* 91.) asserts, that, where the main object of a statute is unreasonable, the judges are not at liberty to reject it ; for, says he, "that were to set the judicial power above that of the legislature, which would be subversive of all government." If there are any absurd consequences, manifestly contradictory to common reason, arising collaterally out of acts of parliament, they, says that elegant author, with regard to those collateral consequences, are void. In a note on this passage, by the learned Mr. *Christian*, he remarks in the following language : " If an act of parliament is clearly, and unequivocally expressed, with all deference to the learned commentator, I conceive it is neither void in its direct nor collateral consequences, however absurd or unreasonable they may appear."

Litchfield,
June,
1822.

Goshen
v.
Stonington.

This question occurred in the case of *Calder* & ux. v. *Bull* & ux. 3 *Dallas* 386. before the supreme court of the *United States*, which contains many interesting observations on the subject before us; but eventually it was determined on a different ground. *Paterson*, J. manifested a strong aversion to retrospective laws of every description, as being unsound legislation, and not accordant with the fundamental principles of the social compact; but expressed no opinion relative to the possible disallowance of them, by the judiciary. *Chase*, J. declared, that he could not recognize the omnipotence of state legislatures. He observed, "that the purposes for which men enter into society, will determine the nature and terms of the social compact; the nature and ends of legislative power, will limit the exercise of it;" and throughout his opinion, he exhibits a strong inclination of mind against laws which are retroactive. But without deciding the question, after a designation of laws which are retrospective, he concludes, by saying; "Such laws may be proper or necessary, as the case may be." Judge *Iredell* delivered a clear and decided opinion, containing principles entirely adverse from those, which his associates had expressed. "If," says he, "a government composed of legislative, executive, and judicial departments, were established, by a constitution, which imposed no limits on the legislative power, the consequence would inevitably be, that whatever the legislative power chose to enact, would be lawfully enacted; and the judiciary power could never interpose to pronounce it void. It is true, that speculative jurists have held, that a legislative act against natural justice, must, in itself, be void; but I cannot think, that, under such a government, any court of justice would possess the power to declare it to be so." It is incontrovertible, that the question under discussion, was not decided in *Bull* & ux. v. *Calder* & ux.; and even *Chase*, J. admitted, that retrospective laws might be proper and necessary, while *Iredell*, J. delivered an explicit opinion, that they were beyond the correction of the judiciary.

In *Dash* v. *Van Kleeck*, 7 *Johns. Rep.* 506. the validity of retrospective laws underwent a very able and learned discussion; but, eventually, on this point, nothing was decided. The judges universally agreed in the legal propriety of *construing* a statute, in prevention of its having a retrospect, if the court were not restrained, by expressions, explicit and unequivocal. *Yates*, J. considered the legislature, as possess-

ed of competent authority to pass the law in question; and *Thompson*, J., without having expressed a determinate opinion on the validity of retroactive laws, came to the result, that a law " ought not to have a retrospective operation, unless so declared, in the most unequivocal manner." Ch. J. *Kent* was pointedly opposed to the retrospection of laws, impairing vested rights in any event; while *Spencer*, J. insisted, "that (their) state legislature, when acting within the pale of the constitution of the *United States*, and of (that) state, has the same omnipotence, which Judge *Blackstone* ascribes to the *British* parliament." From this brief view of *Dash* v. *Van Kleeck*, there is no ground of pretence, that the controverted point, relative to retroactive laws, underwent a decision.

*Litchfield,*
June,
1822.

Goshen
*v*
Stonington.

In the sister state of *Massachusetts*, it repeatedly has been determined, that anterior vested rights ought not to be impaired, by *construction*; (*Wales* v. *Stetson*, 2 *Mass. Rep.* 143. 146. *Call* v. *Hagger* & al. 8 *Mass. Rep.* 423 427. *King* v. *Dedham Bank*, 15 *Mass. Rep.* 447.) and an *obiter* opinion was expressed in *Foster* v. *The Essex Bank*, 16 *Mass. Rep.* 245. that an act of the legislature, which injures private property, or disturbs vested rights, should be declared void.

In result, I feel myself authorized to assert, that the question, where no constitutional objection exists, whether the judiciary may declare a retrospective law operating on vested rights, to be void, is undetermined; that men of profound learning and exalted talents, have greatly differed on the subject; and that it is an enquiry beset with difficulty.

With those judges, who assert the omnipotence of the legislature, in all cases, where the constitution has not interposed an explicit restraint, I cannot agree. Should there exist, what I know is not only an incredible supposition, but a most remote improbability, a case of the direct infraction of vested rights, too palpable to be questioned, and, too unjust to admit of vindication, I could not avoid considering it as a violation of the social compact, and within the controul of the judiciary. If, for example, a law were made, without any cause, to deprive a person of his property, or to subject him to imprisonment; who would not question its legality, and who would aid in carrying it into effect?

On the other hand, I cannot harmonize with those, who deny the power of the legislature to make laws, in any case, which, with entire justice, operate on antecedent legal rights. A retrospective law may be just and reasonable; and the right

of the legislature to enact one of this description, I am not speculatist enough to question. I believe no person will deny, that the exercise of legislative authority, merely, and without further consequences, to confirm marriages, not duly celebrated, is valid, although clearly retrospective, and manifestly operating on the rights of individuals. And as every law intrinsically implies an opinion of the legislature, that they had authority to pass it, and that it is just and reasonable, on all occasions that may arise, it is proper to demand, that the supposed unjust violation of legal right, by statute, should be established, with great clearness and certainty. If a judge of the supreme court of the *United States* was authorized in the assertion (*Calder* & ux. v. *Bull* & ux. 3 *Dallas*, 386. 395.) that he would not decide any law to be void, except in a very clear case; with equal propriety may other judges adopt the same resolution, in respect of laws, which cannot be brought to the definite test of a written constitution. but which, as violations of the social compact, are claimed to be unwarrantable.

The act of *May*, 1820, was intended to quiet controversy, and promote the public tranquility. Many marriages had been celebrated, as was believed, according to the prescriptions of the statute. On a close investigation of the subject, under the prompting scrutiny of interest, it was made to appear, that there had been an honest misconstruction of the law; that many unions, which were considered as matrimonial, were really meretricious; and that the settlement of children, in great numbers, was not in the towns, of which their fathers were inhabitants, but in different places. To furnish a remedy coextensive with the mischief, the legislature have passed an act, confirming the matrimonial engagements supposed to have been formed, and giving to them validity, as if the existing law had precisely been observed. The act intrinsically imports, that the legislature considered the law of *May*, 1820, to be conformable to justice, and within the sphere of their authority. It was no violation of the constitution; it was not a novelty; such exercises of power having been frequent. and the subject of universal acquiescence; and no injustice can arise from having given legal efficacy to voluntary engagements, and from accompanying them with the consequences, which they always impart. The judiciary, to declare the law in question void, must first recognize the principle, that every retrospective act, however just and wise, is of no validity; and that for the correction of every deviation

of the legislature from absolute right, theirs is the supremacy. Impressed with the opinion, that this is beyond the confines of judiciary authority, I am satisfied with the decision at the circuit, and would not advise a new trial.

CHAPMAN, BRAINARD and BRISTOL, Js. were of the same opinion.

PETERS, J. concurred in the result, on the ground that the marriage was originally valid; but he thought that the confirming act was void.

New trial not to be granted.