# SUPREME JUDICIAL COURT

FOR THE

## COUNTY OF HAMPDEN, SEPTEMBER TERM 1864, AT SPRINGFIELD.

———

PRESENT :

Hon. GEORGE T. BIGELOW, Chief Justice.
Hon. CHARLES A. DEWEY, ⎫
Hon. THERON METCALF, ⎪
Hon. EBENEZER R. HOAR, ⎬ Justices.
Hon. HORACE GRAY, Jr., ⎭

———

## Inhabitants of Monson vs. Inhabitants of Palmer.

If a person whose settlement is in dispute is proved to have removed from one town to another, a new trial will not be granted on account of the admission of evidence, for the purpose of proving his domicil in the latter town, that he came to the latter town and said that he had sold out at the former town, and had come down and wanted to go to work; provided no special request was made for an instruction to the jury that his declaration was not of itself competent evidence of the fact of his selling out in the former town.

If the parents of illegitimate children intermarry, and the father acknowledges them as his, the children are, by St. 1853, c. 253, made legitimate to all intents and purposes, and thereupon take the settlement of the father.

CONTRACT to recover for the support, as paupers, of Julia Ann Calkins and her seven children. The case was tried in the superior court, before *Vose*, J., and reported for the determination of this court, upon facts which are stated in the opinion.

*J. Wells*, (*H. Morris* with him,) for the plaintiffs.

*P. C. Bacon*, (*J. G. Allen* with him,) for the defendants.

Hoar, J. The jury have found specially that William B. Calkins, the husband and father of the paupers for whose support the action is brought, had his residence in Palmer for more than ten years consecutively ; and it is conceded that he was then over twenty-one years of age, and paid all taxes assessed upon him for five of those years. His settlement in Palmer is therefore established, if this finding can be supported ; and it becomes unnecessary to consider the correctness of the rulings upon another part of the case, in which the plaintiffs undertook to show that he also had gained a settlement in another mode.

The objection which is made to the verdict by the defendants is founded upon the admission of the testimony of the father of Calkins, that his son " came back to Palmer in September 1834, and said he had sold out at Becket, and had come down, and wanted to go to work." This evidence was offered to show the intention of the son at the time to change his residence from Becket to Palmer ; and upon this intention that part of the case turned.

It has been settled by a series of cases in this commonwealth that, as a question of domicil usually involves not only actual residence, but the intention and purpose with which such residence is accompanied, it is competent to give in evidence declarations of intention, accompanying the acts of the person whose domicil is to be proved. *Thorndike* v. *Boston*, 1 Met. 242. *Kilburn* v. *Bennett*, 3 Met. 199. *Cole* v. *Cheshire*, 1 Gray, 441. If what Calkins said, therefore, is to be fairly construed as expressive of his intention in leaving Becket, or coming to Palmer, or of his purpose to regard one or the other as his fixed place of residence, and it was a declaration accompanying an act which it explained or qualified, there can be no doubt that it was competent evidence. It is urged by the counsel for the defendants that it is a mere narrative of a past transaction which it would not be admissible to prove by such a declaration ; that the time when Calkins sold out at Becket, if at all, was not proved in any other way, and would have, if fixed, an important

influence on the minds of the jury ; that it is not admissible to prove facts by mere declarations, and then draw an inference of intention from the facts thus proved ; but you must prove the facts otherwise, and may then give a character to those facts by the declarations of intention which accompanied them. And it is certainly true that the declaration of Calkins did not lawfully prove or tend to prove the fact which it recited, and that it would have been proper so to instruct the jury, if instructions had been asked. But we think the objection is not stronger than in many cases where evidence is admitted which is competent for one purpose, and not for another ; and yet has some tendency to affect the minds of the jury in relation to matters in proof of which it is not admissible. The practical inconvenience is merely incidental, and seems to be inevitable. The fact was proved that Calkins had come from Becket, and was then at Palmer. In connection with this fact his declaration was made. And the court are of opinion that, though not very strong or decisive evidence, it was competent for the consideration of the jury, and that it was within their province to determine its meaning. It had some tendency to show that he wished it to be understood that he had done with Becket, and had come to establish himself at Palmer.

The decision of this question of evidence is sufficient to enable the plaintiffs to retain their verdict, which was for nominal damages only, to be amended hereafter according to the agreement of the parties, by the report of an assessor. But the more difficult question remains, and will present itself on the assessment of damages. That question is, whether children who were illegitimate at the time of their birth, but whose parents afterward intermarry, and their father acknowledges them as his children, acquire thereby the settlement of the father ? It appears by the report that four of the children of Calkins, for whose support as paupers the plaintiffs claim compensation, were born between 1849 and 1856 ; that Calkins had at that time a lawful wife living, from whom he was divorced in 1856 ; and that he then married the mother of the children, and acknowledged them as his own.

At the time of their birth, these children were illegitimate, and therefore had the settlement which their mother then had, which it is not contended was in Palmer. St. 1793, c. 34, § 2. *Boylston* v. *Princeton*, 13 Mass. 381. Rev. Sts. c. 45, § 1. This was the rule expressly established by the statute of 1793; and it has been held that the law was the same as to illegitimate children born before the statute of 1789. *Blackstone* v. *Seekonk*, 8 Cush. 75, and cases there cited. By St. 1789, c. 14, § 3, illegitimate children took and followed the settlement of their mother until they should gain one of their own. *Petersham* v. *Dana*, 12 Mass. 429.

The first provision for inheritance by illegitimate children was made by St. 1828, c. 139, as follows: "Every illegitimate child shall be considered an heir at law of its mother, and inherit as such when she shall die intestate." *Cooley* v. *Dewey*, 4 Pick. 93. The same statute provided that the mother should in like manner inherit from the child. This statute applied exclusively to intestate estates; and was substantially reënacted by Rev. Sts. c. 61, § 2, with an express limitation against any claim by right of representation. This limitation was afterward modified by St. 1851, c. 211, so as to allow an illegitimate child to inherit from any maternal ancestor. But it was held in *Kent* v. *Barker*, 2 Gray, 535, that, in regard to testate estates, illegitimate children were not to be regarded as children in the construction of statutes. In the opinion given by Thomas, J., however, it is expressly noticed that the decision does not affect the case of an illegitimate child, when the parents marry after its birth, and the father after the marriage acknowledges the child.

A particular provision for the case last named was originally made by St. 1832, c. 147, entitled "An act in further addition to an act regulating the descent and distribution of intestate estates." If the parents had other children born after the marriage, the children were made to inherit from each other, and the mother from the children, as if all had been born in lawful wedlock. The commissioners appointed to revise the statutes reported this enactment as a section in the chapter entitled "Of

title to real property by descent," and without essential modification, except allowing the father as well as the mother to inherit from the children.  In a note, they called the attention of the legislature to the fact that the statute was inoperative, unless there were other children born after the marriage ; but said that they had no means of conjecture whether this was accidental or designed, as they knew not the reasons on which the statute itself was founded, " it being an innovation upon the law as immemorially practised, and transmitted to us by our ancestors ; " and left it " to the wisdom of the legislature, if they should see fit to continue this law in force, to modify it in such manner as should be thought proper." The legislature did not adopt the obvious tendency of these suggestions ; but, on the contrary, extended the operation of the section as reported by the commissioners, and enacted it in these terms : " When, after the birth of an illegitimate child, his parents shall intermarry, and his father shall, after the marriage, acknowledge him as his child, such child shall be considered as legitimate to all intents and purposes, except that he shall not be allowed to claim, as representing either of his parents, any part of the estate of any of their kindred, either lineal or collateral.  Rev Sts. c. 61, § 4.  So far the subject was treated only in connection with the descent of property.

But St. 1853, c. 253, was entitled simply "An act concerning illegitimate children whose parents intermarry ; " and it enacts that, " when, after the birth of an illegitimate child, his parents have intermarried or shall intermarry, and his father has acknowledged, or shall, after the marriage, acknowledge him as his child, such child shall be considered legitimate to all intents and purposes." By the second section, " the fourth section of the sixty-first chapter of the Revised Statutes, and all acts inconsistent herewith, are hereby repealed." This statute is substantially retained in the General Statutes, with the omission of the words " to all intents and purposes ; " and is found in § 4 of c. 91, " of title to real property by descent ; " but there is no intimation from the commissioners who revised the statutes that any change in the law was intended.

The case at bar is governed by the statute of 1853. Its terms are as broad and general as the language affords. And we do not think there is such evidence that the intention of the legislature was to confine their application to the single subject of the descent of property, as will authorize this court to interpret it in any narrower sense by implication, than that which the import of the language used naturally suggests.

In considering the probable reasons which led to the passage of the law, it is to be noticed that the consanguinity is established, for all purposes of lineal or collateral transmission of property, by evidence which the law deems conclusive. It cannot be supposed that the right of the father to the obedience and services of the child, and the corresponding obligation of protection and support, were not designed. The parents having remedied the wrong occasioned by their illegal and immoral conduct, to the extent of their power, by the marriage, it may well be supposed that the legislature intended to remove the stigma which had attached to the innocent offspring. We can see no reason, on the contrary, why children taken to be legitimate for all other purposes should not have the settlement of their father. That they should have it is consistent with the letter of the law in every particular; and, while the pauper laws are a system of fixed rules which are to be steadily applied without much latitude of construction, yet if we look into the general objects and purposes for which they are framed, it is equally consistent with these.

It is no sufficient objection that this construction may change the settlement of children, already acquired. That consequence has not unfrequently happened, under the operation of causes over which towns have no control. Under the *St.* of 1789, the marriage of the mother would of itself have changed the settlement of her illegitimate children. Under *St.* 1793, legitimate children, having the settlement of their mother, followed the settlement which she acquired by another marriage. *Plymouth* v. *Freetown,* 1 Pick. 197. The whole subject is very clearly and fully discussed by Mr. Justice Metcalf, in discussing the somewhat analogous case of a legislative enactment limiting

the evidence admissible to show the invalidity of a marriage, in the recent case of *Goshen* v. *Richmond*, 4 Allen, 458 ; and cases are there cited from Maine and Connecticut, in which it has been held that an act of the legislature, sanctioning an informal marriage, was valid ; and that the settlement of the children of the marriage, already born, would be thereby transferred, under the operation of the pauper laws, to the town of the father's settlement. *Lewiston* v. *North Yarmouth*, 5 Greenl. 66. *Goshen* v. *Stonington*, 4 Conn. 209.

Except so far as the change of settlement is concerned, there is no retroactive effect of the statute of 1853 which bears upon the parties to this suit. The supplies were not furnished by the plaintiffs till after the legitimacy of the children had been established.

We have examined carefully the statutes in relation to the support of poor persons by their kindred ; Gen. Sts. *c.* 70, § 4 ; and to the adoption of children ; Gen. Sts. *c.* 110 ; but do not find in them anything which tends to vary the conclusion to which we have arrived.

The result is that there must be a judgment for the plaintiffs for such sum as an assessor shall find is due to them for relief furnished to the wife and all of the seven children of Calkins.