IN THE

# SUPREME COURT OF JUDICATURE

OF THE

## STATE OF NEW JERSEY,

### AT NOVEMBER TERM, 1864.

---

### JOHN SCHRODER v. JOHN EHLERS.

1. A magistrate authorized to convict on view and impose a penalty, has no right to arrest the offender before conviction.
2. The powers of justices of the peace defined.
3. A non-resident of this state cannot be convicted on the view of the justice, by force of the game law prohibiting trespasses with guns.
4. A justice of the peace, who is the owner of the land trespassed on, cannot convict or act as justice in such case.
5. *Query.* Has the legislature the power to make a man judge in his own case?

---

Error to Hudson Circuit.

For plaintiff, *R. D. McClelland.*

For defendant, *C. H. Winfield.*

BEASLEY, C. J.   This case has been brought before us by a writ of error to the Hudson county Circuit Court.

It is an action of trespass.   The declaration contains four counts, each of which charges the defendant, with more or less particularity, with assaulting and beating the plaintiff

44

and committing other acts of personal violence.    Three pleas have been interposed, but as the questions to be considered arise out of the second of them, it will be necessary to advert only to that.    This plea, which purports to answer so much of the charge of the declaration as relates to "the seizing, laying hold of, pulling, shaking, dragging, striking, binding, fastening, gagging, choking," "imprisoning and detaining in prison," and "exposing the plaintiff to the public gaze in the public street," sets up, in substance, the following justifica-tion, to wit: that the plaintiff and certain other persons, with guns and dogs, was trespassing and gunning in and upon certain lands not belonging to or in the possession of the plaintiff, nor of such other persons, situate in the township of North Bergen, in the county of Hudson, without the written consent of the owner or occupier thereof, and against the form of the statute, &c.; whereupon the defendant, then and there being justice of the peace of the county of Hudson, and who then and there saw and had view of the said breach of the peace and violation of the said statute, then and there gently laid hands upon the said plaintiff, as he lawfully might for the cause aforesaid, that he might be dealt with accord-ing to law, &c., and necessarily and unavoidably imprisoned the plaintiff, and kept and detained him until the said defend-ant, as justice of the peace as aforesaid, adjudged that the said plaintiff, who, at the said time when, &c., was not a resident in the state of New Jersey, should pay the fine pre-scribed in such case made and provided; and to prevent his escape and resistance to the authority of the said defendant, as such justice of the peace, the said defendant did then and there necessarily tie the hands of the said plaintiff, that the said defendant might place him in custody of a constable, using no more force than was necessary for the said plain-tiff's detention in custody; and that, afterwards, while the said defendant was so detaining the said plaintiff, because of his refusal to deliver up his gun and pay the fine as aforesaid, at the special solicitation and request of the said plaintiff,

upon the delivering up the said gun and paying the said fine, and with the consent of the said plaintiff discharged the said plaintiff, &c.

To this plea there is a special replication, which will be noticed hereafter, and which has been demurred to. The effect of the demurrer is to open the question as to the substantial sufficiency, in point of law, of the above plea.

The plea is evidently founded in the supposed immunity which the first section of the statute of this state for the protection of game, *Nix. Dig.* 334,* affords to the defendant. The supposition of the pleader appears to have been that the first section of this act regulates the proceedings against non-residents who trespass with guns on lands in this state. I shall, for the moment, consider the plea on this assumption.

The first section of the act in question provides that if any person shall carry any gun on any land not his own, and for which the owner pays taxes or is in the lawful possession, unless he hath license or permission in writing from the owner or legal possessor, every person so offending and convicted thereof, *either upon the view of any justice* of the peace within this state, or by the oath or affirmation of one or more witnesses before any justice of the peace, &c., shall forfeit and pay to the owner of the soil or his tenant in possession the sum of five dollars, with costs of suit, &c.

The authority conferred by this clause upon justices of the peace is to convict upon view or upon the testimony of other persons.

The plea claims that a justice has the right, in person, to arrest without process before conviction, and to retain the party convicted in custody after judgment against him. As the statute does not confer this power, if it is possessed it must reside in the magistrate *virtute officii.*

In its origin the office of justice of the peace was purely ministerial. It did not authorize the exercise of any judicial power whatever. At first justices were mere conservators, or, as ancient authors styled them, "wardens" of the peace. Lord Holt says, that in the beginning they were no more

*Rev.*, p. 448, § 1.

than high constables; and in 2 *Hawkin's Pl. C.* 34, *cap.* 8, § 11, it is stated that the power of such conservators of the peace, whether by tenure, election, or prescription, was not greater than that of constables, unless where it had been enlarged by some special grant or prescription. Thus, too, Chitty, 2 *Gen. Prac.* 128, with his usual learning and accuracy, defines the limits of this office in the following words: "anciently the functions and jurisdictions of one or more justices of the peace, when not assembled at general or quarter sessions, were almost entirely *ministerial, viz.,* to preserve order and prevent breaches of the peace, and to cause malefactors to be apprehended and their appearance secured to take their trial for alleged offences before a higher tribunal, either at the assizes or sessions." And it was not until the enactment of various acts of parliament, in the reign of Edward III., that a judicial function was annexed to this office, such function appertaining exclusively to the administration of the criminal law. In more modern times, the increase of population and the multiplication of small causes of action, incident to the accumulation of wealth and the advance of society in civilization, rendered it expedient to delegate cognizance over small matters of civil jurisdiction to this class of subordinate magistrates, and accordingly we find various enactments with this view, both in England and in this country.

It thus appears that the authority of a justice of the peace, by virtue of his office, is wholly ministerial—to prevent breaches of the peace and bring criminals to justice. Their civil power is wholly statutory, and where none is expressly conferred they do not possess it.

This slight historical view seems to clear up the question involved in this pleading. The entry upon the lands in question was in no wise a breach of the peace, but a simple tort, of a civil character. Its punishment appertained not to criminal but civil jurisdiction. Although present at the act invasive of the right of the owner or possessor of the land, the justice had no more authority to make an arrest than a constable or sheriff would have possessed, if present at the

occurrence. The statute merely authorized the magistrate to convict on view. His conduct, as described in the plea, was a gross violation of law, whether considered as a public offence or a private injury.

Independent of this false theory on which the plea before us rests, it is, in several other particulars, substantially defective. *First.* It does not aver that " the owner was in the lawful possession " of the premises trespassed upon, " or paid taxes " for the same—the statute is express upon this point, and gives the penalty only when this is the case. *Second.* It does not answer what it professes to answer. It admits tying the hands of the defendant, but discloses no circumstance rendering this extreme act necessary. *Third.* It does not state what the judgment was which was rendered by the defendant, merely averring it was the judgment authorized by the act. This is a mere opinion of the defendant. Good pleading required that the fact should be so stated that the court could see that it was a judgment warranted by law.

Thus far the case has been considered as though the facts disclosed brought the transaction within the scope of the first clause of the act under consideration. But this is not so. This clause does not relate to proceedings against non-residents. It is the third and eleventh clauses which provide for that occasion. This is evident from the fact, not only that the penalties denounced are of a severer character, but also from the circumstance that they are given to a different person, and in language which implies that the prosecution is to be by complaint. A non-resident under this act cannot be convicted on the view of the magistrate. Non-residence is not a fact that could be determined on the view of the magistrate, and the act does not authorize the absurdity.

This view disposes of the case; but as the pleadings present another point, which is of some general interest in the construction of this and other acts, it may be proper briefly to consider it.

The replication which has been filed to the plea, which is the subject of the foregoing criticism, is by way of confession

and avoidance, and disclosed the fact that the defendant was the owner and possessor of the *locus in quo*, and that, consequently, he acted as a judge in his own case. The ground of objection suggested is that his acts on this account were *ipso facto* void.

That a person cannot be a judge in his own case has ever been regarded as one of the fundamental maxims of the law of nature. A perception of its injustice must have been intuitive in the human mind, and if the legislative power is competent to authorize so flagrant a violation of natural equity it must be conceded that such power is politically omnipotent within the sphere of its operation. Whether such be the case, or whether there are any other restrictions upon the legislative branch of the government than such as are prescribed in the written constitutions of the states, are questions which have been frequently discussed, and which have not been, as yet, definitely settled. It is generally said that the power of the English parliament is indefinite and illimitable. This is the language of Blackstone and some of the other commentators and ethical writers, but I am not aware that the doctrine has ever received any judicial sanction. There are, certainly, many judicial *dicta* to the contrary. Thus, Lord Coke says—" And it appears in our books, that in many cases the common law will control acts of parliament, and sometimes adjudge them to be utterly void; for where an act of parliament is against common right and reason, or repugnant or impossible to be performed, the common law will control it and adjudge such act to be void." *Bonham's case*, 8 *Rep.* 118. The same doctrine was strenuously maintained by one of the judges in Tredgor's case, as far ago as the year book of 8 *Ed. III.*, 30 *b.* It is to be found also in Saint Germain's celebrated treatise, containing the dialogues between the Doctor and Student, *p.* 11; and in the case of *Day* v. *Savadge, Hob.* 87 *a*, it was said from the bench, " even an act of parliament, made against natural equity, as to make a man a judge in his

own case, is void in itself; for *jura naturæ sunt immutabilia,* and they are *leges legum.*"

There are a number of other cases which might be cited, but the above are sufficient to show, that if in England at this day an act should be passed totally subversive of any of the great natural rights of man, a question by no means settled but open to very grave doubts, would be presented for adjudication.

In this country likewise, this important subject has received considerable attention at the hands both of judges and speculative writers, and the preponderance of authority seems to be adverse to the omnipotence of the legislative power. This side of the controversy is certainly sustained by the great names of Marshall and of Story. The following will be found to be some of the principal cases: *Fletcher* v. *Peck,* 6 *Cranch* 87; *Taylor* v. *Porter,* 4 *Hill* 146; *Blood-good* v. *Mohawk R. R. Co.,* 18 *Wend.* 56; *Goshen* v. *Stonington,* 4 *Conn.* 225; *Wilkinson* v. *Leland,* 2 *Pet.* 654; *Bowman* v. *Middleton,* 1 *Bay.* 252.

But it is not necessary to pursue the argument. The point before the court can be resolved by the use of the ordinary rules of statutory construction. It is a mere question of legislative intention, the simple inquiry being, did the legislature mean, when they said that a justice of the peace might commit on view, to authorize a person to adjudge a fine to himself for a trespass to his own farm? The language of the act is general, and the intention therefore of the law makers, may be ascertained with peculiar propriety from the effects of the statute. The particular rule of construction applicable to this section of the act, is the following, *viz.,* that where some collateral matter, which is absurd and manifestly repugnant to common reason, arises out of the general words of a statute, the judges are to conclude that this consequence was not foreseen, and, as to it, to disregard the act. The illustration of this rule, given by Blackstone, is the case now before the court. He says, " thus if an act of parliament gives a man power to try all causes within

Schroder v. Ehlers.

the manor of Dale, yet if a cause should arise in which he himself is a party, the act is construed not to extend to that, because it is unreasonable that any man should determine his own quarrel." 1 *Black. Com.* 90. Construed in the light of this principle, the meaning of the clause of the act in question is too obvious to need further explanation. I think the replication good.

The judgment of the Circuit Court should be reversed, and judgment entered on the demurrer in favor of the plaintiff.

ELMER, J. The pleas to which the plaintiff answered by his replication being bad, the judgment should have been for the plaintiff on the demurrer to the replication, and not for the defendant. They are evidently founded on the impression that the justice was entitled to arrest a person carrying a gun on land not his own, whereby such person subjects himself to the penalty prescribed by the first section of the act for the preservation of deer and other game. *Nix. Dig.* 310*. This is a mistake. A justice, as a conservator of the peace, has power to arrest criminals or persons guilty or threatening to be guilty of a breach of the peace; but he has no power to arrest a person, who, in his view, carries a gun on other people's land. That is not a criminal act or a breach of the peace. The eleventh section of the act authorizes the owner or possessor of the lands to apprehend a person offending, if he is not a resident in this state, and take him before a magistrate to be dealt with according to law. But the pleas do not aver that the defendant was the owner or possessor of the land.

Besides this objection to the pleas, they are defective in not showing a sufficient defence to the acts of binding, fastening, striking, &c., alleged in the declaration. The allegation is, that having arrested him, to prevent his escape and resistance to his authority as a justice of the peace, he then and there necessarily tied the hands of the plaintiff. If the arrest had been by an owner of the land as such, an allegation that he tied his hands to prevent his escape would not have been a good justification of such an act. Nothing but the necessity

*Rev., p. 448, § 1.

of thus preserving himself from an attack of the party arrested to answer a charge of having incurred a penalty, could justify such a proceeding.

The replication sets up that the justice was himself the owner of the land trespassed on, and in my opinion is a complete answer to the pleas. "No man can be a judge in his own cause." 3 *Burr.* 1858.* Summary convictions, such as are authorized by the act in question, are *stricti juris,* and the magistrate who would protect himself must show that his proceeding was warranted by the law. *Crepps* v. *Durden, Cowp.* 640. It is said by Lord Holt, in 1 *Salk.* 396, that the mayor of Hereford was laid by the heels for sitting in judgment in a case where he was a party, although by the charter he was the sole judge. It appears by the same book, 201, that laying by the heels means that he was attached for the misdemeanor and punished as guilty of a crime. The power given by the act for a justice to convict, must, in my opinion, be held to mean a justice who is not the owner or possessor of the land, and as such entitled to the penalty. The owner is entitled to arrest and to prosecute before a justice, which, in the nature of things, means another person and not himself. It is a case of absolute want of jurisdiction, as clearly so as would be a judgment in debt rendered by a justice in his own favor. It is not, therefore, a case coming within the statute to promote the impartial administration of justice. *Nix. Dig.* 375. Having no power to act in the case at all, no challenge of the justice was necessary, nor does his adjudication protect him.

Judgment for plaintiff.

VAN DYKE, J., concurred.

CITED in *State* v. *Crane, Collector,* 7 *Vroom* 398–402.