# Hogatt *v*. Bingaman.

Notice of demand and protest of negotiable paper cannot be given through the post office, unless the same is to be transmitted by mail.

IN ERROR from the circuit court of the county of Adams.

MONTGOMERY & BOYD for plaintiff in error.

This was an action of assumpsit on defendant's indorsement of a note made by E. Bell for twenty-seven hundred dollars. Pleadings in common form.

On the trial plaintiff read the note sued on, and the deposition of Cook, which proved demand, non-payment and protest of the note, and that notice thereof to defendant was lodged in the post-office at Natchez, where the note was payable, addressed to the defendant at Natchez. It was admitted that the post office in Natchez was the nearest to the defendant's residence, and the one at which he usually received his letters and papers, and that he resided without the limits of the city.

The court instructed the jury that if they believed the defendant resided nearer the post office at Natchez than to any other, and that the notice was not intended to go by mail, then the notice would not be sufficient unless given to him in person, or left at his residence or usual place of business; which instruction is assigned for error.

POTTER for defendant in error.

Notices to indorsers may be sent by the post, where they are to be sent "through the post office to the post office nearest the party entitled to notice." Ireland *v.* Kip, 11 John. Rep. 232; Shed *v.* Brett, 1 Pickering, 411; Hussy *v.* Freeman, 10 Mass. 87. That is, they may be so sent when they are to be transmitted or con-

48*

Hogatt *v.* Bingaman.

veyed from one post office to another by the mail. The general rule is, that where the parties reside in the "same place," the notice must be personal, or something tantamount; and where the parties do not reside in the same, the notice may be sent by mail. Now this "same place" is not a locality designated by the limits of a town or city; but it is rather a vicinage or neighborhood. It may be in and around a town where a post office is located, or it may be around a post-office located in a rural district. Barker *v.* Hall, 1 Martin & Yerg. 183.

The term, town, or city, does not convey the meaning of the rule as to the place, in cases of this kind. The word "town," is used in some parts of the country to designate a locality circumscribed by city limits; in other parts it describes a tract of country in which there may be neither a city, town proper, or even a village; or such "town" may include one or more towns proper or a city, and even both. Thus the "town" of New Haven, Ct. embraces a tract several miles square, within which is the city of that name, and also the villages of Barnesville and Fair Haven. The same kind of towns are found in New York.

There may be two "places" in the same town; and where a notice is sent by mail to a town in which there are two post-offices, it must be sent to the office nearest the indorser; for that is his "place" to receive it. Cuyler *v.* Nellis, 4 Wend. 398.

So, where there are two post-offices in the same town, the holder residing near the one office may transmit a notice by mail to an indorser residing near the other; for the holder resides at the place where the notice should be mailed, and the indorser resides at the place where it is to be delivered. Ranson *v.* Ranson, 2 Hill's N. Y. Rep.

A notice transmitted by mail to the post-office, near which the indorser resides, is sufficient, because the indorser resides at the place, although not within the town. So where the indorser resides near the town where the holder lives, they both reside at the same place.

Where notice is sent by a messenger, to an indorser residing at a different place, it must be left with the indorser, or at his house or place of business. In such a case, the messenger may not deposit the notice in the post office of the place where the indorser

Hogatt *v.* Bingaman.

resides; because notice by a messenger is in the nature of personal notice. Now suppose the defendant, in this case had sought to notify as an indorser the postmaster at Natchez, could he so contrive to give the notice, that, under the rule for notice where the parties reside at different places, it should be a notice by the post? Or suppose the postmaster has notified the defendant as an indorser by delivering a notice to him from the post-offices, would it be notice by the post, or a personal notice?

It is an universal rule, that a notice to an indorser, sent "by the post," must be deposited in the post-office in time to "go out" by a particular mail; now when should the notice to this defendant have been deposited in the office, and by what·mail was it to "go out?"

It is said that the holder is only bound to exercise due diligence, and that a deposit in the post-office was, under the circumstances of this case, a compliance with the rule; but it has to some extent become a settled rule of law that a party must give notice in a particular manner, or he will not be permitted to show due diligence. Thus it is well settled, that where the holder and indorser reside in the same place, proof of a notice deposited in the post-office does not show due diligence, although the indorser regularly receives his letters there; because the holder is to be the active party, he is to give the notice, and in such a case to bring it home to the indorser; the latter is not bound to go after it. On this ground the decision in Bank of Columbia *v.* Lawrence, 1 Peters' Rep. is erroneous. The reason for that decision is, that it would be inconvenient to the holder to serve personal notice on an indorser residing three miles distant, and it was accordingly imposed as a duty on the indorser to go the same distance and get the notice. In that case, as in this, there was no proof that notice was received in due time.

The conclusion is, that where notice is sent by mail, it must be deposited in one post-office to be forwarded by the post and delivered to the indorser at another office; that, where holder and indorser reside at the same place, the notice may not be there deposited in the post-office; and that this defendant was as much entitled to personal notice as if he had resided within the limits of the city of Natchez.

Other authorities applicable to this case are cited in the opinion delivered by this court in the case of Patrick *v.*Beazley, 6 How. 609.

Counsel for plaintiff insist on the "presumption" that the defendant did receive this notice; but "notice is of the essence of the contract, and ought not to rest on presumption or inference." Patterson Bank *v.* Butler, 7 Hal. 258; Smedes *v.* Bank of Utica, 20 Johns. Rep. 372; Chitty on Bills, ed. of 1836, p. 511, 643.

Suppose this presumption to be correct, where was the proof, direct or circumstantial, that this notice was received in due time?

Again: it is urged that the authority of Stamps *v.* Brown, Walker's Rep. overruled in Patrick *v.* Beasley, should be confirmed, because it had become a rule of action in this state.

The same argument will sustain the decision in Patrick *v.* Beazley. On this point there can be but this question: what is the law, and in which of these two cases was the true rule declared? If the case of Stamps *v.* Brown passed without deliberation, it was properly reviewed; if the decision was founded on a mistake of law, or a misapprehension of the case there quoted and relied on, it was the duty of this court to correct it. Williams *v.* Germaine, 7 Barn. & Cres. 408, Lord Tenterden. Lord Eldon felt bound to understand the principle of a case before he confirmed it. Aldrich *v.* Cooper, 8 Vesey, 388. Lord Ellenborough overruled a case "as having been decided against principle." Purcell *v.* McNamara, 9 East, 161.

Kent considers that hasty and crude decisions ought to be examined without fear and revised without reluctance. 1 Com. 477. There can be no doubt of the power of courts to *review* and correct former decisions; the three thousand cases overruled, denied, doubted, or limited in their application, collected by Mr. Greenleaf, show that this power has been not rarely exercised.

Mr. Justice CLAYTON delivered the opinion of the court.

The only question in this case is, whether it is sufficient to give notice through the post office of the dishonor of a note or bill of exchange, when the parties live in or near the same town, and use the same post office; or, in other words, when the post office is used as a place of deposite, not as a medium of transmission.

This point has heretofore been repeatedly before the courts of

Hogatt *v.* Bingaman.

this state, and they have, unfortunately, given contradictory decisions. The first case reported is that of Stamps *v.* Brown, Walker 576, in which it was held that such notice was sufficient. The case of Wilcox & Fearn *v.* McNutt, 2 How. 784, next came up. It was there held that the notice was insufficient, and that the custom of the notaries at Vicksburg to give notice in that way could not alter the law. The next case in order is that of Patrick *v.* Beazley, 6 How. 609, in which the same doctrine is held as in 2 How., but by a divided court.

The question is now again presented to us, and a change of the decisions in these two last cases is most earnestly pressed on us, upon the ground that long usage and practice under the first decision had consecrated it, and any departure from it will cause the loss of millions of property. These arguments address themselves with persuasive force to our minds, and had so much weight with the judge who dissented in the case of Patrick *v.* Beazley that he delivered a very able opinion in their support. A favorite maxim with one of the most powerful modern statesmen was, "*ne movete quieta*"—do not disturb things that are settled; and this maxim deserves great weight with every judge. It should require very controlling considerations to induce any court to break down a former decision and lay again the foundations of the law.

Yet, in the case before us, little room is left for the influence of reasons like these. The decisions already stand opposed to each other. Six years after the first decision was made, a different rule was adopted. Five years have since elapsed, and this court has already again declared its intention to abide by the rule last adopted. It would certainly not tend to add stability to our decisions, and to give permanence and duration to our recorded opinions, were we now to retrace our former steps and go back to the rule in Walker.

The case of Patrick *v.* Beazley upon its face shows that it was decided upon mature deliberation. Most of the reported decisions were examined, and the principle established vindicated by showing it to be in accordance with the current of decisions. This conclusion is sustained by a very recent case in 2 Hill's N. Y. Rep. 590, in which this often litigated question was discussed. The

supreme court of that state, more conversant with commercial law in all its bearings than any other in the union, without dissent say, "Whether mail service of notice is good or not, does not depend upon the inquiry whether the person to be charged resides within the same legal district; but upon the question whether the notice may be transmitted by mail from the place of presentment or demand to another post office where the drawer or indorser usually receives his letters and papers." See, to same effect, 19 Maine, 447.

Were the question an open one in our state, I should be of opinion that the rule thus laid down is correct; and, as it accords with the two latest decisions of our highest tribunal, I feel bound to give it my concurrence.

The judgment of the court below is affirmed.

Judge SHARKEY concurred.

Mr. Justice TURNER, dissenting, delivered the following opinion:

It has become necessary for me to reconsider my opinion delivered in the case of Patrick *v.* Beazley, 6 How. 609; and, after the most mature reflection, I have abundant reason to be satisfied with that opinion, and am strengthened and confirmed in the view I then took of the subject, by the facts and circumstances of the cases now before us.

In one of the cases now under consideration, the facts are these, as stated in an agreed case: The plaintiff was the holder of two promissory notes, one dated in 1835, the other in 1839, each payable on the 1st January, 1840, at the Commercial Bank of Rodney, to the order of W. H. Compton, the defendant, who indorsed them to the plaintiff; that, on the 4th of January, 1840, the usual presentment and demand were made at the bank, at the close of business hours, payment was refused, and written notices of presentment, demand, non-payment and protest were made, addressed to Compton, at Rodney, and were placed in the post office at that place on the same day; that Compton resided within three miles of Rodney, in the country, and was in the habit of getting newspapers and letters at that office, which was the nearest post office

to his residence, and that he was usually at Rodney once or twice a week in the winter months, and commonly called at the post office every time he went there.   On this statement of facts, judgment was rendered in favor of the defendant at November term, 1842, after the opinion of this court, in the case of Patrick *v.* Beazley, was published in the newspapers of the state; and the plaintiff sued out this writ of error.   In the other cases argued and submitted to us, the facts are the same in substance.   The notes sued on, in the several cases now before us, bear date in 1835, 1836, 1837, 1838 and 1839, respectively, all made and protested since the decision in the case of Stamps *v.* Brown, which was decided in 1832, and reported in Walker's Rep. p. 527, published in 1834, and previous to the case of Patrick *v.* Beazley, reported in 6 How. 609.

Thus, we find a uniformity in the usage and custom of our state, in cases like the present, from Woodville to Manchester; and it is fairly to be presumed that all our·banks, merchants, notaries and lawyers were acquainted with this usage, and acted in conformity thereto.   It was sanctioned and sustained by the unanimous opinion of the supreme court of our state, by a judge who presided at the trial of the case of Stamps *v.* Brown, and by every judge and jury in the state, as far as I am informed, up to the decision of the case of Patrick *v.* Beazley, in 1841.   Contracts were made under the guidance and sanction afforded by the decision of Stamps *v.* Brown, and is it lawful, is it reasonable, is it just, now to change the rule, and render null and void transactions and contracts made whilst that decision was in force, and considered as the law of the land?

I am informed that cases similar to the present have frequently occurred in the circuit court of the United States for this state, judge McKinley presiding; and he decided in conformity to the principles laid down in the case of Stamps *v.* Brown; and that when the cases relied on to support the contrary rule, found in Tennessee, New York and other reports, were cited, the judge very properly remarked, that if he were presiding in the courts in those states, or in cases which happened there, he would be governed by those decisions; but that as he was sitting in a case which arose under our laws and usages, the decision of our su-

*Hogatt v. Bingaman.*

preme court as to those laws and usages would govern him, and suits to a vast amount of money were so decided in that court within the last few years. These cases afford additional evidence of the prevalence of the custom and usage relied on and sustained in the case of Stamps *v.* Brown.

I have not been able to find a single case where the courts have changed a rule of this sort, where it would tend to discharge indorsers from their liabilities. Usages and customs may be altered for the convenience of trade and commerce, and to give better security for debts and greater facility in collecting them. Penny posts are adopted by usage and not by statute, and a notice sent by it is sufficient. Our post offices in cities and towns supply the place of penny posts in other and larger cities, such as New York, &c. See Story on Bills, 452, secs. 382, 289, 297, 300, 305.

But I have been told that the decision in the case of Stamps *v.* Brown is not law. And why and wherefore is it not law? Where are we to look for rules of action in matters of this sort? The common law tells us nothing about it. Rules of this kind are formed by courts of justice, on due inquiry made by the usages and customs which have prevailed for a long period of time among men of business. Hence we find the ablest judges both in England and America, and among them Lords Holt, Mansfield, and Marshall, calling up distinguished men in trade, men of business, capital and credit, to testify as to the usages of trade and commerce, and from information derived from that source, laying down and prescribing the rule, in order to enforce contracts and liabilities made and incurred under and in pursuance of those usages. See Story on Bills of Ex. 316, secs. 289, 382; 2 Camp. Rep. 208. Courts of justice adopt the usages and customs of merchants in places such as London, Liverpool and New York. And sometimes the legislature interposes and adopts, alters or creates the rule; and when thus declared the rule operates prospectively only, and not retrospectively, as in case of the change of a rule by judicial decision. After such manifest and palpable evidence of the usage of our own state, sanctioned and confirmed by the highest judicial authority, it is my opinion the rule should not be changed to operate retrospectively, but if it is thought better to

have the rule as laid down in the case of Patrick *v.* Beazley, let it be done by "rule of court" or by legislative authority, and then the people will have notice of the rule, and can act accordingly.

The usages and rules as to presentment and notice observed and enforced in several of the states of this Union, have not prevailed in all. In a case in New Hampshire, where the holder and maker resided fifteen miles apart, and in a thinly settled country, a presentment eight days after a note fell due was held to be sufficient to charge the indorser. 1 N. H. Rep. 140.

In a case in Pennsylvania, in 1792, where notice of the nonpayment of a note was not given to an indorser until four or five days after it became due, McKean, chief justice, observed that before the revolution it was not usual to give notice to an indorser, or even to call upon the maker as soon as a note became due, and to have done so would have been considered harsh and unreasonable. 2 Dall. 188, 233; 1 Serg. & Rawle, 324.

In most of the states, a protest of a promissory note is not necessary in order to charge an indorser. In Kentucky it is said to be different. 1 Monroe, 91.

In Holland, eleven days of grace are allowed ; in Hamburgh, twelve; in England, three ; in the district of Columbia, four ; and so on, according to the convenience and usages of tradesmen and bankers, in each particular state or place. Chitty on Bills, 233 to 236.

In most commercial countries, where a note falls due on great hollidays, such as christmas, the christian sabbath, the fourth of July, commencement day at Harvard University, &c., a demand on the day previous is sufficient to charge an indorser. 4 Wendell, 2 Cain. It was holden in Massachusetts, as late as 1803, that days of grace were not allowable on promissory notes. 4 Mass. Rep. 251. And Dane, in his abridgment, says, that when the court gave the opinion in that case, (allowing days of grace,) it was new, as it was in Mississippi until the year 1809, when our first bank was established. Our country people until then knew nothing of days of grace, or strict mercantile or bank usages. In the case of Harrel *v.* Bixler, Judge Hampton presided at the trial, at Liberty in Amite county, and charged the jury that the custom of merchants, allowing three days of grace, was not applicable to

Hogatt *v.* Bingaman.

country transactions, such a usage being unknown among them, and sustained the plaintiff under the proof of demand and notice, made at Liberty on the very day the note fell due, allowing no days of grace ; and that case is the one reported in Walker, 176. It was decided at June term 1824, and not December 1824, as stated in the book.* Our country people, until the establishment of the bank, knew of no rule or usage among them about days of grace, or strict mercantile or bank usages. And they have a mode in Louisiana to this day, I believe, derived from the Spanish law, which formerly prevailed there, and in Mississippi, of having no days of grace, it is by making a note payable at a day fixed.   7 Martin, 460.

In some places a note payable on demand is not entitled to days of grace.   In others they are.   This was regulated by statute in Mass. in 1824, as I have been informed.

Again : in our state, we find from Walker's Rep. p. 100, in the case of Offutt *v.* Vick's executors, where the suit was on a dishonored bill of exchange, mercantile usage, as to days of grace, was recognized and allowed, in sustaining the liability of an indorser : and in the case of Chance *v.* Wright, Walker, 156, Ch. J. Hampton, in delivering the opinion of the court, used this language: " Though at first strongly inclined to overrule the motion, believing that substantial justice had been done by the verdict, yet as it is manifestly in violation of the law regulating accountabilities resulting from the circulation of negotiable paper, we have felt bound to grant a new trial.   We have witnessed the great hardship produced by the application of the strict law merchant, to the transactions of plain illiterate men in the country, who take and transfer notes, without any reference to the strict conditions imposed by the law governing such transfers, &c.," and from that time to this, days of grace have been allowed on all negotiable paper, except notes payable on demand.

Chief Justice Marshall, in several cases reported in Wheaton and Peters, recognized local usage about days of grace and the mode of notifying indorsers in the district of Columbia and other places, and therein he followed the example set by other judges in other places, in order to enforce contracts, and hold indorsers to

At December term 1824, I took my seat on the supreme court bench.   E. T.

their liabilities, contracted under and with a view to those usages. The court did not refer the parties to or bring them under the operation of usages which existed in other places, and till then, that they should have observed the foreign and have disregarded the local usage. They decided, as other distinguished courts and judges have done elsewhere in all ages, they endeavoured to ascertain and establish the usages of the place where the contract was made and to be performed, and to hold parties liable to their contracts and engagements, made under, and according to those usages. After the decision of the case of Stamps against Brown, the notaries and men of business were bound to notice and to follow the rule there recognized and established; at least, they might be excused for following it: and indorsers were bound to take notice of it. And the several cases brought up to this court, since that time, show conclusively to my mind, that that usage prevailed throughout the state.

On subjects of this kind, where are our citizens to look for rules of conduct? Are they to go beyond the limits of our own state, and enquire and follow what may be lawfully done in New-York, Massachusetts, Tennessee, or elsewhere? Suppose they find their rules different from ours, which should they follow? We have our own rules and usages, and are bound to submit to, and follow them. If we do not, our courts will compel us. We are not bound by the decisions of other states, but we are by our own, and must conform to them, or our rights and interests will be sacrificed.

The case of Wilcox & Fearn *v.* McNutt, 2 Howard, does not conflict with the case of Stamps *v.* Brown. The rule laid down in the former is expressly recognized in the latter, which preceded it. The rule I allude to is this: that where the indorser resides within the limits of the town or city where the bill or note is dishonored, personal notice, or notice left at the party's dwelling, is required. There is a distinction between that case and these now under consideration. In these, as in the case of Stamps *v.* Brown, and Patrick *v.* Beazley, the indorser resided beyond the limits of the town, and nearer to the post offices of those towns than to any other, and notice was given by leaving a copy at the post office nearest the indorser's residence. Can any sensible

reason be given between the case of a notice transmitted by mail to a distant post office for distribution, and notices placed in the post office by hand for distribution? Is a person more likely to receive the one than the other? See 1 Peters, 578.

But, after the decision of the case of Stamps *v.* Brown, the usage and custom of our banks, and of men of business, in relation to the mode of giving notice to indorsers in cases like the present, became fixed and settled law, and all persons within our jurisdiction were bound by the rule, usage and custom, there stated and recognized. Suppose a notary, who followed the rule prescribed in that case, should be sued by the holder of a note for neglect, in not giving personal notice in a case like that, and he should plead in his defence that he went by the rule prescribed by the supreme court of the state; would that plea avail him? If not, hard indeed will be his case. It is hard enough for creditors to lose their money by a change of the rule, after they have contracted and acted under it; but how much harder is the case of the poor notary, whose interest it is to do his duty faithfully, having no other interest in the case beyond his fees? If the decision in the case of Patrick *v.* Beazley is to prevail, it is impossible to conceive the extent of the injury which must result to the holders of indorsed notes. Look at the very cases now before us.

No mischief resulted from the decision in the case of Stamps *v.* Brown. I have never heard of any. The reason is obvious. The court sustained the usage of the country, and the parties have been held liable to comply with their promises, made with a knowledge of those usages.

No injury has yet resulted from the decision in the case of Patrick *v.* Beazley. That cause went off on another point, viz., the want of notice to a previous indorser. And if any have followed that rule since, no injury can possibly happen, as the notice is required to be personal. But the mischief that is to result from that decision, if persisted in, is now about to happen, without any fault, laches, or neglect of the holders of the notes sued on, or of the agents employed in making demand, and giving notice of non payment. I confess I feel alarmed at the consequences which

will result to creditors, if the rule is to be changed, and made to act retrospectively.

But is there any thing unreasonable in the usage, as recognized and enforced in the case of Stamps *v.* Brown? I think not. The post-offices of our country are public offices, kept open every day for the use and convenience of all persons whatsoever; a place established by law, where all persons may receive and forward letters. There are both certainty and safety in depending on it. But how different is`it, when notice is sent to one residing at his private house in the country. He may be absent; and then the notice is left at the house, perhaps with no person, perhaps with careless or unfaithful servants; perhaps with thoughtless children. Personal service is not required. Due diligence is all that is requisite. Suppose a note protested at Clinton or Natchez, or elsewhere out of Jackson, and the indorser resides nearest to the post-office at Jackson, but out of town; the notice sent to the post-office at Jackson is sufficient. But if protested in Jackson, the notice deposited in the post-office there is insufficient. And for what reason? According to my judgment, there is no good reason for the difference. I think the usage recognized in the case of Stamps *v.* Brown is decidedly the most convenient for all parties, and I am in favor of adhering to it.

Ch. J. Martin, of Louisiana, is reported to have said, on an occasion like the present, that "we do not consider ourselves at liberty to change the settled jurisprudence of this court. It is meet, that while we settle the rights of parties litigant before us, the rest of the community should find in our decisions a rule on which they may rest assured that future cases of the same kind will receive the same determination; and that our decisions should be beacons, and not decoys or snares. If the principles we establish are found inconsistent, the legislature may do, what was done by the parliament of England, fix a rule, by which future cases may be determined." 15 Louis. Rep. 245, Hamer *et al. v.* Johnson *et al.*

Judges have frequently had occasion to say, that if the question had not been previously adjudged, they would decide differently. 1 Ves. jr. 13, 17; 19 Ves. 478, 479; 2 Hill's Rep. 87.

In the case of Wilcox & Fearn *v.* McNutt, before cited, and now

relied on, the court says, "it is dangerous in all cases, to disregard the well-settled law; that it would be extremely embarrassing to suffer the rule to fluctuate; that it is of the utmost importance to mercantile transactions, to have a certain and stated rule in relation to notices."

In the case in 4 Dev. & Bat. the court says, that if they were now for the first time deciding the question, they would decide it differently, but would not disturb the old decisions, from consequences resulting from a change of the rule. And again, laws are not binding, having a retrospective effect. 2 Conn. Reports, 566; 2 Gall. 105, per Kent in case of Desh *v.* Vankleek; 2 Cranch, 272; 4 Burr. 2460; 4 Conn. Rep. 209; 6 ibid. 54; 15 Louis. Rep. 245.

In most of the cases reported in our law books it will be seen, that the leaning of the courts of justice has constantly been to enforce the contracts and liabilities of the parties, and not to discharge them therefrom, but for good and sufficient cause founded in reason and law.

The case reported in 1 Peters' Rep. 578, the Bank of Columbia, use of the Bank of the United States *v.* John Lawrence, is expressly in point. That case was decided in 1828, four years previous to the decision of the case of Stamps *v.* Brown. The note was made in Georgetown, payable at the Bank of Columbia, in that town, and the indorser resided in the county of Alexandria, three miles distant, and out of the limits of Georgetown. But the post-office in Georgetown was nearer to his residence than any other post-office, and he was in the habit of receiving letters at that post-office. The notice was addressed to the indorser, at Georgetown, and placed in the post-office of Georgetown, and held sufficient, by the unanimous opinion of the judges of the Supreme Court of the United States, including Chief Justice Marshall, and Judges Washington, Story, Trimble, and others. Our supreme court made the same decision in a similar case, and our citizens have conformed to it. This case is cited with approbation by Judge Story, in his Commentaries on Bills of Exchange, sec. 295, in note; sec. 297, and note. See Kent's Com. 4. ed. Lect. 44, p. 106, 107; 2 Hill's N. Y. Rep. 587; 2 Peters, 549; 4 Wend. 398.

I am therefore of opinion that the judgments in the cases to which this opinion applies be reversed, and new trials be granted.